## IN RE MARSDEN'S APPEAL.

PATENTS; PATENTABILITY.

A material consisting of the comminuted cellular portion of corn-pith freed from sappy, deleterious, and adherent matters by subjecting the pith to the action of heat, *held* to be not anticipated by applicant's prior patent disclosing corn-pith obtained by passing cornstalks through breakers and then separating the pith from the fiber and outside shell, as there is no description in the patent that the pith is subjected to heat.

No. 103. Patent Appeals. Submitted January 10, 1899. Decided February 8, 1899.

HEARING on an appeal from a decision of the Commissioner of Patents rejecting an application for a patent. *Reversed.*

The facts are sufficiently stated in the opinion.

*Messrs. Foster & Freeman* for the appellant.

*Mr. W. A. Megrath* for the Commissioner of Patents.

Mr. Justice MORRIS delivered the opinion of the Court:

This is an appeal from a decision of the Commissioner of Patents wherein he refuses to allow letters patent to the applicant, Mark Worsnop Marsden, for an alleged invention made by him in the matter of materials for packing and for other purposes.

The application was refused on the ground that the alleged invention had been anticipated and was covered by letters patent issued to other persons, and especially by a patent issued to the applicant himself on February 19, 1895. But on the argument before us the refusal was narrowed down, as indeed it had already been in the Patent Office, to the supposed anticipation by the applicant himself in the patent to which reference has been made. In other words, the invention of the present issue was not deemed in the Patent Office to be materially or substantially different from that of

the patent of February 19, 1895. And the inquiry, therefore, is, not whether the applicant has produced a new material in itself patentable, which seems to be conceded, but whether the article now produced is not substantially identical with that of the former patent.

The subject matter of the present alleged invention is an article manufactured from cornstalks, in which the applicant seems to have been a pioneer inventor. In his specification the applicant states his process and the thing which he claims to have invented in the following terms:

"Raw pith (of corn), as it is found in its natural state, consists of a cellular structure, the cells of which either contain sap or dried or partially dried sap, and with which are combined certain adherent matters, the precise character of which is not known.

"I have discovered that raw pith when compressed has a capacity to absorb many times its volume of liquid, and Letters Patent No. 534,611 were issued to me February 19, 1895, for a leak protector for vessels, consisting of a filler composed essentially of such compressed and comminuted cornstalk pith. An attempt to make use of it for other purposes showed that in its natural condition it was not suitable therefor. . . . Attempts to remove the deleterious materials before referred to by means of washing and drying proved to be ineffective, and such treatment will not result in a substantial change of the characteristics of the raw product. I discovered, however, that it was possible to eliminate these objectionable characteristics and to effect profound chemical changes in the pith and to produce a practically new article therefrom. I have effected this result by first separating the pith from the woody shell or outer fibrous portion of the stalk, and then heating and breaking up the pith, in some instances comminuting it until the particles are about the size of grains of rice, and in subjecting the pith during or after this treatment to the action of a blast or current of air, preferably heated.

"The pith is broken up by percussive action, and the matter which has been deposited within the cells is thereby loosened, so that the subsequent air blast can readily remove the same; and in practice I submit the pith to repeated heating, beating and washing with air blasts, until the desired result is secured. The higher the temperature to which the pith is subjected the better; but care must be taken to prevent its ignition. . . .

"The product thus produced differs radically and distinguishably both from the raw pith, as found in nature, and from the said pith compressed as set forth in my prior patent, the compression, however, not resulting in any change in the constituent characteristics of the pith, but simply in bringing it into a different structural condition."

And the claim of the application is: "The within described new material adapted for use for packings and other purposes, the same consisting of the comminuted cellular portion of corn-pith freed from sappy deleterious and adherent matters and having the characteristics substantially as set forth."

In the applicant's previous patent of February 19, 1895, the claim was: "As a protection for vessels or other structures, a filler composed essentially of compressed comminuted cornstalk pith, substantially as described."

And in the specification the purpose and process of the invention were described in these terms:

"The object of my invention is to protect vessels, forts or other structures from the injurious effects of the rupture of the shells or walls occasioned either by collision, projectiles or otherwise; and to this end my invention consists in combining with the compartments or spaces of such structures the pith or the pith and fibers of cornstalks, as fully described hereinafter.

"Efforts have been made from time to time during many years to provide some means of readily and effectually closing openings made in the hulls of vessels from collisions or pro-

jectiles. Different substances have been proposed, and some have been used, that have proved more or less serviceable; but none have fully secured all the results desired. . . .

"After many experiments and tests with different materials, and with different methods of preparing different materials, I have discovered that a material can be prepared from cornstalks, either Indian corn or maize or broom corn, which possesses in a high degree all the qualities desired. To this end I take cornstalks and cut them into short lengths in some instances, or where large breakers are used the stalks are thrown into the same whole, and the fiber, pith and outside shell are all broken up together, and the comminuted pith is separated and used for the purposes of my invention. I have found by experiment that this substance has a most extraordinary capacity to absorb water or moisture; . . . that after the substance has been saturated and then dried it recovers substantially its former condition; . . . that it can be secured in comparatively large grains or pieces, thus avoiding the loss from dust in breaking up a material into fine particles; . . . that it is inodorous, colorless and incapable of making any stain, is absolutely inert and incapable of producing any injurious effect upon the health from its presence; that it is light in weight, its specific gravity being very small; . . . and that it is elastic and not liable to crumple in use. . . .

"The material is placed in the compartments and compressed therein, or is compressed into blocks of any desired size or density, and then may be packed in suitable spaces or compartments. The compressed blocks or loose material may be packed in the compartments, or spaces under hydraulic or other suitable pressure."

The several tribunals of the Patent Office have held that the article, claimed in the application now before us to be an invention, is not substantially different from the article described in the patent of February 19, 1895, the only difference in their opinion being a difference merely in the degree·

of dryness.    In this conclusion we find ourselves unable to concur.

The process of the patent is certainly different from the process of the present application.   In the process of the patent dried cornstalks are taken,—and it is not apparent that the process necessarily requires any artificial drying,— and they are broken up and comminuted, and the pith is then separated from the fibrous matter and compressed for use.    There is no application of heat beyond that which is necessarily developed in the process of comminution, and this can not in any proper sense be called an application of heat.    Certainly it is not the *"high temperature"* for which the specification of the present application calls, and, as has been stated, there is not in the process of the patent necessarily any use of the air-blast or of artificial drying.

. On the other hand, in the process of the present application heating is an essential element—heating to a high degree of temperature anywhere below the point of ignition; and even "repeated heating, beating and washing with air-blasts." And it is the element of heat, enabling the deleterious matters to be more effectively segregated and removed, that constitutes the characteristic difference between the present process and that of the patent.

Now that the application of heat may operate in many cases wholly to transmute structurally and even chemically the material which is subjected to its influence, is an elementary principle of physics and a thing of daily experience.    Is that the effect in the present case, and does the application of heat in the mode suggested by the applicant in his specification to the pith of the cornstalk produce a structural or chemical change in that pith which makes it substantially a different thing from the pith in its natural state, and a different thing from the compressed pith of the applicant's previous patent?    The answer to this question does not seem to be difficult.    This article, claimed to be a new material, has been subjected to microscopic and

chemical analysis by persons competent to make the investigation, and who are apparently disinterested; and their affidavits filed in the case show satisfactorily that this article is structurally and chemically different from the article of the patent of February 19, 1895. A more conclusive showing than this could scarcely be required of the applicant under present conditions.

As the utility of this new material is not contested, and as, in our opinion, it is sufficiently shown that it differs substantially from the article of the patent of February 19, 1895, we must conclude that there was error in the refusal to grant a patent to the applicant. We think that he is entitled to a patent.

It follows that we must reverse the decision of the Commissioner of Patents and remand the cause to the Patent Office for such other proceedings therein, according to law, as may be right and proper.

The clerk of this court will certify this opinion and the proceedings had in this court to the Commissioner of Patents, according to law.